**UNITED STATES of America,
Plaintiff–Appellee,**

**v.**

**Joan MCKENNA, Defendant–Appellant.**

**No. 01–10357.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 11, 2003.

Filed April 18, 2003.

---

* The Honorable Richard F. Cebull, United States District Judge for the District of Mon- tana, sitting by designation.

John J. Jordan, San Francisco, CA, for the defendant-appellant.

Laurie Kloster Gray, Assistant U.S. Attorney, San Francisco, CA, for the plaintiff-appellee.

Before GOODWIN, TASHIMA, and WARDLAW, Circuit Judges.

GOODWIN, Circuit Judge:

Joan McKenna appeals her convictions of perjury (18 U.S.C. § 1621) and making a false declaration under oath (18 U.S.C. § 1623) for various statements she made during the course of her civil action against the government stemming from a

---

car accident she had with a United States Postal Service (USPS) mail truck. McKenna challenges numerous aspects of the criminal proceedings. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. The Civil Case

In December 1994, the car McKenna was driving was hit by a USPS mail truck. Her car sustained $63.55 in damages; the mail truck had no damage. In 1997, McKenna sued the government, alleging physical injuries and seeking $1,000,000 in damages. The government, through AUSA Emily Kingston, first deposed McKenna in July 1998. In that deposition, Kingston, after stating that "we've already talked about the February '94 accident" (McKenna had already advised the government that she had been in another accident in February 1994),[1] asked whether McKenna had ever had any kinds of injuries to her spine or neck. McKenna answered only that her spine had fused when her son was born but had since recovered.

In September 1998, Dr. Victor Prieto, an orthopedic surgeon retained by the government, examined McKenna and asked about her medical history. She told him about the February 1994 accident and a February 1997 slip-and-fall accident that resulted in a broken ankle; McKenna apparently mentioned no other accidents to Dr. Prieto. In October 1998, after having obtained a release from McKenna in August 1998, the government subpoenaed her medical records from her chiropractor, Dr. Biase, and learned that McKenna had suffered spine and neck injuries in a November 1994 car accident.[2]

---

1. She filed a civil suit against the other driver, who settled and paid McKenna $15,000.

2. McKenna filed a civil suit against the other driver (who was uninsured), claiming that she had suffered neck and back injuries; she was

In April 1999, McKenna submitted corrections to her July 1998 deposition, explaining, *inter alia,* that the court reporter had experienced equipment problems during the first fifteen minutes of the deposition, which had affected "[s]ections of the transcript up through p. 11," and that she had in fact listed the November 1994 accident in that deposition. Kingston again deposed McKenna in July 1999, and asked about McKenna's claim that the court reporter's equipment had malfunctioned during the first deposition. McKenna reiterated that she had told Kingston about each of her three car accidents as the reporter was setting up and that just as Kingston said they would go into each of those accidents the reporter indicated there were machine problems and left the room.

McKenna's civil case then proceeded to trial before a magistrate judge. During cross-examination, the government asked McKenna: "you didn't tell us about [the November 1994] accident, did you, during discovery?" McKenna answered, "I believe I did," explaining that she thought she had revealed that accident: (1) when she agreed to release her medical records to the government; (2) during the early part of the July 1998 deposition while the court reporter's equipment was experiencing problems; and (3) and during her examination with Dr. Prieto. In October 1999, the magistrate issued written findings of fact and conclusions of law and dismissed the complaint.

B. *The Criminal Case*

In August 2000, a federal grand jury returned a superseding indictment charging McKenna with three counts of perjury in violation of 18 U.S.C. § 1621 (Counts 1, 2, and 4), and one count of making a false declaration under oath in violation of 18 U.S.C. § 1623(a) (Count 3). Count 1 was

based on McKenna's response to Kingston's question regarding spine or neck injuries in the July 1998 deposition; Count 2 arose from McKenna's statements in the July 1999 deposition that she had told Kingston in the July 1998 deposition about the November 1994 accident and that the court reporter had stated she was having equipment problems and left the room during the July 1998 deposition; Count 3 was based on McKenna's statements on cross-examination during the civil trial that she had told Kingston about the November 1994 accident in the July 1998 deposition and when Dr. Prieto examined her; and Count 4 was based on McKenna's statement on cross-examination during the civil trial that the court reporter had problems with equipment and had left the room during the July 1998 deposition.

At her first appearance after indictment, McKenna told the magistrate that she "preferred" to represent herself rather than have an attorney from the Federal Public Defender's Office appointed, explaining that she was concerned that prosecutors would control her attorney as they were all part of the same government system. The magistrate warned of the risks of pro se representation and advised McKenna that the Federal Public Defender's Office was not controlled by the prosecutor's office, and McKenna did not persist in her request.

Thereafter, McKenna made several court appearances without expressing concerns about the two federal defenders appointed to represent her. However, on September 25, 2000, one week before trial, she moved for substitution of appointed counsel. The district court held an *in camera* hearing in which it asked McKenna how many times she had met with her lawyers, the length of the meetings, and

awarded a default judgment of $25,000, but never recovered any money.

whether she was able to communicate her views and ask questions in those meetings. McKenna said that she had met with her attorneys for between one and two hours on three to four different occasions, and had been able to raise her legal concerns and communicate her views. Her main complaint was that her lawyers had refused to read her pro se civil appellate brief, as well as other legal research she had sent them.

The district judge also asked specific questions of McKenna's defense attorneys, who confirmed that they had not read her pro se civil appellate brief, but stated that they had considered and provided answers to every other legal question she had raised, had read the civil transcript,[3] and were ready to proceed. McKenna's lawyers also then agreed to read her pro se appellate brief. McKenna interjected that she did not want them to represent her because of their decision not to file a vindictive prosecution motion. Her lawyers confirmed that they had decided not to file such a motion after reviewing the evidence. The district court then advised McKenna that some defenses are not legally cognizable, some have an insufficient evidentiary basis, and some are strategically unwise. McKenna next argued that it was her right to have a CJA panel appoint a private attorney assigned to her. The court responded: "when you have court-appointed counsel, then you are not free to choose your own counsel. You are—you are—you know, you have a right to have qualified effective assistance of counsel." The court then denied McKenna's motion for new counsel after finding: (1) that there was adequate attorney-client communication; (2) that her lawyers were competent; and (3) that substitution of

counsel would require a lengthy continuance.

After both parties rested, McKenna asked for another *in camera* hearing in which she asked that the court re-open her defense to allow submission of additional evidence going to the bias and bad motives of the government. One of her lawyers confirmed that he had advised McKenna that certain exhibits that she had wanted introduced should not be admitted into evidence. He then asked for a ten-minute recess to discuss with McKenna any new concerns she may have. He also informed the court that he had advised McKenna of her Sixth Amendment right to represent herself, and the court confirmed to McKenna that she had that right. McKenna stated that if she decided to represent herself, she would need time to prepare. The district court responded that it would allow her only the rest of the day to prepare and would recommence trial the next day. After the ten-minute recess, the district court asked if McKenna wanted to proceed with her current representation and she responded: "Yes, Your Honor .... I do."

The next day, while the jury deliberated, McKenna requested and received another *in camera* hearing. She again asked to re-open the case so that additional documents could be admitted as exhibits. McKenna said she had learned from a review of her attorneys' files that the government had conducted a parallel criminal investigation of her that began before the second deposition and before the civil trial. She claimed that this was a basic violation of her constitutional rights and that this information should have been admitted

---

**3.** McKenna also complained that her attorneys had read only an uncorrected version of the transcript from the civil trial when they put her through a mock cross-examination to prepare her for the criminal trial. She did not, however, explain whether the corrections were substantive or merely clerical corrections.

into evidence in her criminal trial. The district court advised McKenna that whether the documents should be admitted was her attorneys' decision, and they had determined the documents should not be admitted. McKenna then asked to fire her attorneys and represent herself in order to re-open the case and present this evidence. The court denied this motion as untimely.

The jury then returned its verdict finding McKenna guilty of Counts 2 through 4, but was unable to reach a verdict on Count 1. A new attorney was appointed to represent McKenna on post-trial matters. That attorney later sought to be relieved because of "irreconcilable differences." The dispute stemmed from a motion for a new trial the attorney was ready to file; McKenna wanted to file additional motions and raise new arguments which her attorney felt were unwarranted. The district court declined to appoint new counsel and advised McKenna as follows:

> I would suggest Ms. McKenna that you review your attorney's motion, and then make a determination as to whether or not that reflects the issues that you think ought to be raised. If, after you have seen it, you think, no, he hasn't raised an issue that you think is important, bring it up with [your attorney]. He'll make a decision on that, and then, if you are unhappy with that decision, then you can communicate with the court.

In addition to the motion for a new trial which her attorney filed, McKenna filed a pro se motion raising additional claims, including a motion to dismiss. The district court denied the motion for a new trial as well as McKenna's pro se motions, finding each of the defense arguments to be without merit. The district court then sentenced McKenna to six months of incarceration, followed by three years of supervised release with the first six months

to be served in home detention; a $10,000 fine; and a mandatory $300 special assessment. This timely appeal followed.

## DISCUSSION

### A. Perjury Trap

■ McKenna argues that Counts 2 through 4 should have been dismissed because the government violated her due process rights when it employed a "perjury trap" to obtain the statements alleged in those counts. Although we have not yet recognized a so-called perjury trap as a valid defense, we have noted cases from other jurisdictions holding that the government violates due process when it "calls a witness before the grand jury with the primary purpose of obtaining testimony from him in order to prosecute him later for perjury." *See United States v. Chen,* 933 F.2d 793, 796 (9th Cir.1991).

The perjury trap doctrine has been applied in other jurisdictions only where the government used "its investigatory powers to secure a perjury indictment on matters which are neither material nor germane to a legitimate ongoing investigation of the grand jury." *Id.* at 796. Thus, "[w]hen testimony is elicited before a grand jury that is attempting to obtain useful information in furtherance of its investigation, or conducting a legitimate investigation into crimes which had in fact taken place in its jurisdiction, the perjury trap doctrine is, by definition, inapplicable." *Id.* at 797 (internal quotation marks and citations omitted).

■ Here, the government did not use its investigatory powers to question McKenna before a grand jury. Rather, it merely questioned McKenna in its role as a defendant during the pendency of a civil action in which she was the plaintiff. The perjury trap doctrine is inapplicable to McKenna's case for this reason. The dy-

namics of grand jury proceedings are substantially different from those in civil depositions and trials. A witness must face a prosecutor's questions in federal grand jury proceedings without the presence of counsel. *See United States v. Mandujano,* 425 U.S. 564, 581, 96 S.Ct. 1768, 48 L.Ed.2d 212 (1976). Such a witness also "has an absolute duty to answer all questions, subject only to a valid Fifth Amendment claim." *Id.* In a civil deposition a witness can be accompanied by her lawyer, who, within the confines of the governing discovery rules, may object to questions and advise the witness not to answer on certain grounds. Furthermore, a lawful and common purpose in taking depositions is to catch a witness in a lie for impeachment use at trial. The role of the government as a civil defendant does not limit its otherwise proper adversarial use of discovery. To apply the perjury trap doctrine to civil depositions would unduly chill the adversarial process, while serving no useful purpose in the administration of justice. The same considerations preclude application of the perjury trap doctrine to civil trials.

Moreover, even assuming *arguendo* that the perjury trap defense could apply to civil depositions or trials, it would be inapplicable here in any event because McKenna fails to establish that the government questioned her in either the July 1999 deposition or on cross-examination during the civil trial for the primary purpose of securing a perjury indictment on matters which were not germane to legitimate issues in the civil proceedings. On the contrary, the record reveals that the government's purposes in deposing McKenna a second time were to understand the corrections she made to the first deposition, to develop the facts with respect to the injuries she suffered from the November 1994 accident, and to evaluate the case for settlement or trial. The government also properly cross-examined McKenna at the civil trial. She took the stand to make her prima facie case against the government, and thereby put her credibility as a witness at issue.

## B. *Sufficiency of the Evidence*

■ A verdict is supported by sufficient evidence if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The elements of perjury for Counts 1, 2, and 4, charged under 18 U.S.C. § 1621, are: (1) false testimony under oath (2) concerning a material matter (3) with the willful intent to provide false testimony. *United States v. Dunnigan,* 507 U.S. 87, 94, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993). Count 3 was charged under 18 U.S.C. § 1623(a), which makes it unlawful to (1) knowingly make a(2) false (3) material declaration (4) under oath (5) in a proceeding before or ancillary to any court of the United States.

McKenna does not dispute that the government presented sufficient evidence to prove that she wilfully gave false testimony when she said in the second deposition and during the civil trial that the court reporter left the room during the first deposition due to equipment problems, and that she had disclosed the November 1994 accident during the first deposition, as well as when Dr. Prieto examined her. She makes three assertions: (1) the government failed to prove the materiality of the statements alleged in Counts 2 through 4; (2) the statement charged in Count 3 was literally true; and (3) the questions giving rise to all four Counts were fatally ambiguous.

### 1. Materiality of the statements alleged in counts 2 through 4

A statement is material if "it has a natural tendency to influence, or was capable of influencing, the decision of the decision-making body to which it was addressed." *United States v. Leon–Reyes*, 177 F.3d 816, 820 (9th Cir.1999). To be material a false statement need only be "relevant to any subsidiary issue under consideration." *United States v. Lococo*, 450 F.2d 1196, 1199 (9th Cir.1971). The government need not prove that the perjured testimony actually influenced the relevant decision-making body. *Id.* Further, materiality is tested at the time the alleged false statement was made: "Later proof that a truthful statement would not have helped the [decision-making body] does not render the false testimony immaterial." *Id.* at 1199 n. 3.

### Counts 3 & 4

The statements alleged in Counts 3 and 4 were material to the magistrate's adjudication of McKenna's civil action. Those counts were based on McKenna's statements on cross-examination during the civil trial that she had told Kingston about the November 1994 accident in the July 1998 deposition and when Dr. Prieto examined her (Count 3), and that the court reporter had problems with equipment and had left the room during the July 1998 deposition (Count 4). These statements were relevant to McKenna's credibility as a witness in her case against the government (a subsidiary issue then under consideration), and were thus material to the magistrate's adjudication of the civil case.

### Count 2

McKenna's materiality challenge to Count 2 presents the question of who is the relevant "decision-making body" with respect to the false statements she gave in the second deposition (that she had disclosed during the first deposition the November 1994 accident and that the reporter had equipment difficulties and left the room during that deposition). As the Fourth Circuit has explained, "[g]iven that a deponent's testimony is not actually addressed to a decision-making body, [the materiality] standard does not neatly apply when ... the defendant is charged with committing perjury in a civil deposition." *United States v. Wilkinson*, 137 F.3d 214, 225 (4th Cir.1998).

The *Wilkinson* court noted that the Circuits have adopted varying standards for determining the materiality of statements given in depositions. *See id.* (citing *United States v. Kross*, 14 F.3d 751, 754 (2d Cir.1994) (applying materiality test for false statements given in grand jury proceedings to hold that a statement given in a government deposition in a forfeiture action under 21 U.S.C. § 881 is material where "a truthful answer might reasonably be calculated to lead to the discovery of evidence admissible at ... trial" because such actions, though civil in form, "are predicated upon a nexus between the property and criminal activity"); *United States v. Holley*, 942 F.2d 916, 924 (5th Cir.1991) (holding that the materiality of statements given in a civil deposition is not limited to issues specifically raised at trial or evidence admissible at trial, but includes matters properly the subject of and material to a deposition under Fed.R.Civ.P. 26(b)(1)); *United States v. Clark*, 918 F.2d 843, 847 (9th Cir.1990) (analyzing whether a false statement made during a civil deposition had a "tendency to influence, or was capable of influencing, the decision of the decision-making body to which it was addressed" from the perspective of the jury in the civil case (internal quotation marks omitted)); *United States v. Adams*, 870 F.2d 1140, 1147 (6th Cir.1989) (holding

that a false statement given in a deposition satisfies the materiality requirement if a truthful statement might have assisted or influenced the fact finder in the underlying lawsuit)). The Fourth Circuit in *Wilkinson* declined to decide which among these standards to adopt, concluding that "overwhelming evidence establishes that the nature of [the defendant's] false declaration unquestionably meets the more stringent standard adopted by the Sixth and Ninth Circuits requiring that the topic of the declaration at issue be discoverable and have the tendency to affect the outcome of the civil suit involved." 137 F.3d at 228.

■ Without citing any authority, the government maintains that Kingston is the relevant decision-maker as she was evaluating the evidence for trial and settlement purposes. McKenna contends, relying on *Clark*, 918 F.2d at 846–47, that the magistrate judge in the civil trial is the relevant decision-maker for evaluating the materiality of the statements alleged in Count 2. The government counters that *Clark* does not support McKenna's argument because it is no longer good law. The government understates *Clark's* viability. The only part of *Clark* which has been overruled is its holding that materiality is an issue of law for the court rather than a question for the jury. *See United States v. Keys*, 133 F.3d 1282, 1286 (9th Cir.1998) (holding that materiality is a question for the jury). We follow *Clark* and hold that a relevant decision-making entity in evaluating the materiality of statements given in civil depositions is the trier of fact in the civil case. *See* 918 F.2d at 846–47.[4]

We now turn to whether the statements alleged in Count 2 "ha[d] a natural tendency to influence, or [were] capable of influencing" the magistrate's decision-making

process in the civil trial. Looking at McKenna's civil case from the point in time of the second deposition reveals that the statements alleged in Count 2 were capable—at least to some degree—of affecting the magistrate's decision-making process in the civil trial, because they would have been admissible to impeach McKenna's credibility if she testified against the government at trial. *See Clark*, 918 F.2d at 847. That is, her false statement in the second deposition (like the same false statement she gave on cross-examination during the civil trial) would have been relevant to whether the magistrate was hearing the truth about McKenna's civil lawsuit against the government.

We reject McKenna's argument that the statements alleged in Count 2 were immaterial because they were merely cumulative evidence of her credibility given that she had already made those same statements in her corrections to the first deposition. *See generally United States v. Ponticelli*, 622 F.2d 985, 989 (9th Cir.1980) (holding that the fact that grand jury already had enough evidence to indict did not make alleged false statement any less relevant), *overruled on other grounds in United States v. De Bright*, 730 F.2d 1255, 1259 (9th Cir.1984) (en banc).

### 2. McKenna's "literally true" defense with respect to Count 3

■ McKenna also argues that the district court should have dismissed Count 3 because she gave an answer that was "literally true" to the government's question on cross-examination in the civil trial asking: "You didn't tell us about [the November 1994] accident, did you, during dis-

---

4. Because we affirm the Count 2 conviction on the basis that the magistrate judge was a relevant decision-maker, we need not reach the government's contention that AUSA Kingston was also a relevant decisionmaker.

covery." In response to this question, McKenna said that she "believe[d] she did," and explained that she thought she had revealed that accident: (1) when she agreed to release her medical records to the government; (2) during the early part of the July 1998 deposition while the court reporter's equipment was experiencing problems; and (3) and during her examination with Dr. Prieto.

■ McKenna correctly states that neither 18 U.S.C. § 1621 nor 18 U.S.C. § 1623 reach a witness' answer that is literally true, but unresponsive. *See United States v. Boone,* 951 F.2d 1526, 1536 (9th Cir.1991). And her first explanation (that she thought she had disclosed the November 1994 accident when she signed the consent for release of her medical records) could indeed be literally true.

Count 3, however, charges McKenna with perjury based *only* on her second and third explanations (that she had disclosed the November 1994 accident in the July 1998 deposition and when Dr. Prieto examined her). The testimony at the criminal trial was clearly sufficient to prove that those statements were not literally true. The court reporter who took the July 1998 deposition, AUSA Kingston, and McKenna's civil attorney all testified that the court reporter did not experience problems with her equipment in that deposition; the testimony also established that McKenna did not in fact disclose the November 1994 accident then. In addition, Dr. Prieto's records and testimony established that McKenna did not in fact inform him of the November 1994 accident when he examined her.

### 3. Fundamental ambiguity

■ In evaluating McKenna's argument that the questions asked of her were

so vague that her answers could not sustain a perjury indictment under *Bronston v. United States,* 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973), we "must consider the context in which the question[s were] asked, as well as the potentially ambiguous wording." *Boone,* 951 F.2d at 1534. A question leading to a statement supporting a perjury conviction is not fundamentally ambiguous where "the jury could conclude beyond a reasonable doubt that the defendant understood the question as did the government and that so understood, the defendant's answer was false." *United States v. Sainz,* 772 F.2d 559, 562 (9th Cir.1985) (internal quotation marks omitted). Generally speaking, the existence of some ambiguity in a falsely answered question will not shield the respondent from a perjury or false statement prosecution. *See United States v. Slawik,* 548 F.2d 75, 86 (3d Cir.1977). It is ordinarily for the jury to decide which construction the defendant placed on a question. *Id.*

### Count 2[5]

Count 2 arose from McKenna's statements in the second deposition in response to Kingston's request that McKenna explain her assertion in the corrections she submitted to the first deposition regarding the court reporter's machine. McKenna answered that she had disclosed the November 1994 accident during the first deposition and that the reporter had experienced equipment difficulties and left the room then. We see nothing fundamentally unclear about this exchange.

### Count 3

■ Count 3 arose from Kingston's question on cross-examination during the

**5.** We need not decide whether the question which gave rise to the statement charged in Count 1 was fatally ambiguous. Because the

jury was unable to reach a verdict on that count, that issue is not before us.

civil trial: "[y]ou didn't tell us about this accident, did you, during discovery?" This question, when viewed in isolation, indeed appears ambiguous because it is not clear which accident "this accident" referred to. Viewing this question in context, however, reveals that "this accident" referred to the November 1994 car accident; the November accident was the focus of Kingston's line of questioning at this point on cross-examination. McKenna's answer explaining each time she had told the government about the November 1994 accident indicates that she shared the same understanding as Kingston with respect to which accident this question addressed.

### Count 4

Count 4 was based on McKenna's response to Kingston's question on cross-examination during the civil trial asking her to explain what occurred with the court reporter's machine in the first deposition. McKenna gave the same response to the same question asked of her in the second deposition which formed the basis for Count 2. Again, we see nothing fundamentally ambiguous about this exchange.

### C. Admission of Conceded Hearsay Evidence

▮ McKenna asserts that Counts 3 and 4 should be reversed because the trial court erred when it allowed the government to introduce a redacted copy of the magistrate's findings of fact and conclusions of law from the civil trial. The government concedes that the magistrate's findings and conclusions were inadmissible hearsay, but maintains that this error does not warrant reversal under the plain error standard. We first note, without deciding, that admission of this evidence for the limited purpose of proving materiality was not necessarily error. That is, this evidence was arguably offered not to prove

the truth of the magistrate's findings of fact and conclusions of law, but to establish that McKenna's false statements had a tendency to, or were capable of, affecting the magistrate's decision-making process in light of the issues in dispute in the civil trial. In any event, we conclude that any error in admitting the redacted findings of fact and conclusions of law was harmless because McKenna did not object at trial, did not request any limiting instruction, and the evidence of her guilt was otherwise overwhelming.

### D. Improper Vouching

▮ McKenna also argues that the government improperly vouched for the credibility of its case by calling Kingston to testify regarding the materiality of the alleged false statements. Improper vouching occurs where the "prosecutor places the prestige of the government behind a witness by expressing his or her personal belief in the veracity of the witness, or ... indicates that information not presented to the jury supports the witness's testimony." *United States v. Hermanek*, 289 F.3d 1076, 1098 (9th Cir.2002). The cases McKenna cites all involve improper vouching by the prosecutor during closing argument. But she does not argue that the government vouched for the credibility of its witnesses in closing arguments. McKenna complains only that improper vouching occurred through Kingston's testimony regarding the materiality of the alleged false statements.

According to McKenna, the government should have "simply admitt[ed] testimony on what the alleged statements were, and then le[t] the jury decide whether those statements were lies, and material lies...." She is mistaken. We have held that in order to prove that a false statement was material, "the prosecution must offer evidence from the prior trial to show

that the defendant's statements were material; simply offering the allegedly false statement itself is not enough." *United States v. Leon–Reyes,* 177 F.3d 816, 819–20 (9th Cir.1999). Thus, we have allowed the prosecution to prove materiality by introducing the complete transcript of the prior proceeding; by presenting testimony from persons who witnessed those proceedings; by presenting testimony from a member of the grand jury or jury; or through witness summaries from the prior proceedings. *See id.* at 820–21.

Kingston, like the prosecutor in McKenna's criminal trial, is an Assistant United States Attorney. But Kingston is not a prosecutor (nor was she part of the prosecution team) in the criminal trial. Rather, Kingston's testimony made it clear that she is an attorney in the civil division of the United States Attorney's Office. Kingston testified only as a witness with personal knowledge of the statements alleged in the superseding indictment in light of factual issues at stake in the civil litigation. Just as any witness to civil proceedings where false testimony was given, Kingston had relevant factual testimony to offer the jury in the criminal case with respect to whether those statements were germane in the civil case. Kingston's testimony was thus properly admitted on the materiality issue. There was no improper vouching here.

### E. *The Verdict Form*

McKenna's argument that the verdict form impermissibly amended the superseding indictment is frivolous. Not only did McKenna not object before the district court, she expressly agreed to the use of this form. McKenna is correct that the verdict form merely summarizes the statements alleged in Counts 1 through 4, does not provide the questions asked of McKenna which prompted those state-

ments, and does not set out the elements of perjury. But the district court provided the jury with both oral and written jury instructions that quoted in full the questions and statements alleged in the superseding indictment and provided the elements the jury must find beyond a reasonable doubt to convict McKenna on each count. The court was also careful to advise the jury that the verdict form was "in summary form" and that the jury instructions, not the form, should control its verdict:

> I've already read to you the rest of the instructions as to count one, count two, count three, count four. That should control your verdict. That is, you have to look at those instructions or be guided by those instructions. And the form of the verdict of the jury is not intended to be an instruction. . . .

The verdict form did not impermissibly amend the indictment.

### F. *The Sixth Amendment*

#### 1. *Substitution of Counsel*

 In asking whether the district court abused its discretion in denying McKenna's motions for substitution of counsel, we review factual findings for clear error and consider three factors: (1) the adequacy of the district court's inquiry; (2) the extent of any conflict; and (3) the timeliness of the motion. *United States v. Adelzo–Gonzalez,* 268 F.3d 772, 777 (9th Cir.2001). McKenna flatly mischaracterizes the district court's inquiries on her motions for substitution of counsel. Even assuming that McKenna's motions for substitution of counsel were all timely, it is clear that the district court did not abuse its discretion in denying those motions.

First, the district court held lengthy *in camera* hearings on each of McKenna's motions to substitute counsel. The court asked specific questions of McKenna and

her lawyers and received detailed answers that revealed an absence of animosity. The record makes it plain that at all times McKenna had been able to meet and discuss her legal concerns with appointed counsel, who were receptive to her questions and concerns.

The court also identified the sources of conflict—which were invariably disputes regarding trial tactics—underlying each of McKenna's motions for substitution of counsel. McKenna wanted her attorneys to file motions which they felt were not supported by the evidence. It is well-settled, however, that this type of dispute is not a sufficient conflict to warrant substitution of counsel. *See United States v. Corona–Garcia,* 210 F.3d 973, 977 n. 2 (9th Cir.2000) (explaining that even if the court were to conclude that a conflict with respect to trial tactics was severe, it would be "disinclined to reverse on that ground because trial tactics are clearly within the realm of powers committed to the discretion of defense counsel in any event" (citing *United States v. Wadsworth,* 830 F.2d 1500, 1509 (9th Cir.1987) ("[A]ppointed counsel, and not his client, is in charge of the choice of trial tactics and the theory of defense."))).

Finally, McKenna's attorneys clearly did not, as she asserts, argue against her motions for substitution of counsel. To the contrary, they carefully assisted her in raising those motions. Indeed, as the district court noted, while answering the court's questions truthfully, McKenna's attorneys were careful not say "anything at all to prejudice[her] position in front of [the court]." *Cf. Adelzo–Gonzalez,* 268 F.3d at 775, 778 (counsel had, *inter alia,* used bad language in speaking to the defendant, had threatened to "sink [the defendant] for 105 years" if he did not accept a plea agreement, advised the court that the defendant was a liar, accused him of feigning ignorance, and vigorously opposed the motions for substitution of counsel).

### 2. *Faretta Claim*

 A defendant's assertion of her Sixth Amendment right of self-representation must be: (1) voluntary and intelligent; (2) timely; (3) not for the purpose of delay; and (4) unequivocal. *United States v. Bishop,* 291 F.3d 1100, 1114 (9th Cir.2002). "A demand for self-representation is timely if made before meaningful trial proceedings have begun. In cases involving jury trials, we have held that a request is timely if made before the jury is selected or before the jury is empaneled ...." *Id.* (internal citation omitted).

 McKenna conveyed interest in proceeding without counsel at only two points. First, she stated at arraignment that she "preferred" to represent herself rather than have counsel from the Federal Public Defender's Office appointed, because such an attorney would be part of the same government system as the prosecutor. She did not persist in seeking to represent herself after the district court explained a federal public defender's independence from the prosecutor's office. This communication, though timely, was not a knowing and unequivocal request to proceed pro se. Indeed, McKenna argues in her opening brief only that her statement that she preferred to represent herself rather than be represented by a federal public defender was timely; she does not assert that this statement was an unequivocal request to proceed pro se. After the case went to the jury, McKenna did make an unequivocal request to proceed pro se in order to re-open the evidence and submit documents her attorneys felt should not be admitted. But, as this request was untimely, the district court did not err in denying it. *See, e.g., Bishop,*

291 F.3d at 1114 (no error in denying *Faretta* request on third day of trial).

### 3. *Ineffective Assistance of Counsel*

 Claims of ineffective assistance of counsel are generally inappropriate on direct appeal. *United States v. Ross,* 206 F.3d 896, 900 (9th Cir.2000). "Such claims normally should be raised in habeas corpus proceedings, which permit counsel to develop a record as to what counsel did, why it was done, and what, if any, prejudice resulted." *Id.* (internal quotation marks omitted). There are two exceptions to this rule against direct review of ineffective assistance of counsel claims: "(1) when the record on appeal is sufficiently developed to permit review and determination of the issue, or (2) when the legal representation is so inadequate that it obviously denies a defendant his Sixth Amendment right to counsel." *Id.* (internal quotation marks omitted).

McKenna urges us to review her claim of ineffective assistance of counsel on direct appeal because the record is sufficiently developed. But she argues numerous grounds for her ineffective assistance of counsel claim and the record is not developed sufficiently for us to review all of those grounds on direct appeal. For example, it cannot be determined from the record what discovery the government had provided to McKenna's attorneys in order to evaluate her claim that they should have made pre-trial discovery requests. The record is also not developed with respect to why her attorneys felt that the motions McKenna wanted filed were not warranted by the evidence, nor does the record include the evidence McKenna asserts should have been admitted. Accordingly,

we decline to review McKenna's claim of ineffective assistance of counsel.

**AFFIRMED.**